51    81
53   789

ELIZABETH M. GREENMAN, APPELLANT, V. JOHN B. SWAN ET AL., APPELLEES.

FILED MARCH 17, 1897.    No. 7192.

Mortgages: PAYMENT TO ONE WITHOUT AUTHORITY TO RECEIVE IT: FORECLOSURE. The evidence in this case examined, and *held* to entitle the plaintiff to a decree as prayed.

10

APPEAL from the district court of Saunders county. Heard below before WHEELER, J. *Reversed.*

*Simpson & Sornborger,* for appellant.

*Good & Good* and *Frick & Dolezal, contra.*

RYAN, C.

This action was brought in the district court of Saunders county for the foreclosure of a mortgage made by John B. Swan and his wife to Liberty Powell. There was a decree for the defendant, whereby was sustained the plea of payment. Since the appeal was taken to this court Mrs. Greenman died, and the action has been duly revived in the name of her representative. The note secured by the mortgage, as well as the mortgage itself, was dated December 2, 1885. The principal note was for $1,000, due five years after date. The semi-annual payments of interest required to be made were evidenced by ten coupons for $35 each. G. W. Dorsey was doing a loan business at Fremont, in this state, for some time previous to and until the year 1882. In that year the Farmers & Merchants State Bank was organized, and, as Mr. Dorsey testified, took up that business. In 1884 this bank was reorganized under the name of the Farmers & Merchants National Bank, which bank is still doing business. After the national bank was organized the farm loan business with eastern parties was conducted in the name of G. W. Dorsey and C. H. Toncray, until some time in the year 1888, when there was organized the Nebraska Mortgage & Investment Company. From its organization until the latter part of 1891, when it passed into the hands of a receiver, this company transacted the loan business above indicated. From this statement it may be noted that the loan to John B. Swan was made through the agency of the Farmers & Merchants National Bank of Fremont, Nebraska. Between this bank and

the Nebraska Mortgage & Investment Company there was no connection whatever, except that the latter was a depositor of the former. G. W. Dorsey was president of both corporations, and C. H. Toncray was, at the same time, cashier of the bank and a director and vice president of the Nebraska Mortgage & Investment Company. The bank and said company were transacting business in the same block, and through the directors' room of the bank a person could pass from the public business office of one institution into that of the other. From the fact that Mr. Dorsey and Mr. Toncray held at the same time official positions in the investment company and in the bank, coupled with the further fact that Mr. Swan speaks of the persons to whom he paid coupons as "they" and "them," it has resulted that there exists considerable confusion as to the party in each instance to whom he paid his coupon. It may be assumed, however, that after the mortgage and investment company came into existence he made the payments to the cashier of that corporation. Just before the loan fell due the premises mortgaged were transferred by Swan to O. S. Christian, and by him the payment of the principal note was made to the Nebraska Mortgage & Investment Company. The dispute between the litigants is as to whether the company's failure to pay over the amount thus received by it is chargeable to plaintiff or defendant; in other words, whether this company was the agent of the mortgagee or of the transferee of the mortgagor.

The loan was made through Mr. Dorsey and Mr. Toncray of moneys which had been collected for Liberty Powell. The note and mortgage were made directly to him. Mr. Powell was never seen or consulted with by either Mr. Dorsey or Mr. Toncray with reference to the making of this loan. Mr. Calder, who lived near the place of residence of Mr. Powell, transacted this business in the state of New York, where Mr. Powell lived. In reference to the loan now under consideration Mr. Dorsey testified on cross-examination as follows:

Q. Did you ever have any communication with Liberty Powell concerning this matter of John B. Swan?

A. No, sir.

Q. Mr. Calder was your agent in New York for the negotiation of loans?

A. Yes, sir.

Q. He authorized you to make loans?

A. Yes, sir; sent us money and sold loans.

Q. He was your fiscal agent in that region down there for both of your corporations when they had these matters in hand?

A. Yes, sir.

Q. Your bank and your company were agents for negotiating the loans of Mr. Calder?

A. Yes, sir.

On the same subject Mr. Toncray, by deposition, testified as follows: "Loans were sent John Calder for sale. When disposed of by him proceeds would be sent to me. We were authorized, when a loan matured, to receive payment on the same and credit it to this account, and he would exchange it for some loan that he had in his possession, or would instruct us to forward the proceeds to him. Sometimes money would remain in our hands several months without being applied to the purchase of another loan called for by him. We were never accustomed to remit him the principal of loans until asked to do so, it being understood that the same should remain with us for reinvestment. We made monthly and semimonthly remittances of interest only." Being asked what authority, if any, the Nebraska Mortgage & Investment Company had to collect money for Liberty Powell, and how and from whom such authority had been obtained, and how much money was collected, if collected, Mr. Toncray said: "It simply had the authority that comes from a custom and practice which had been in force for fourteen years, and that had always proved satisfactory. No other system was ever offered or suggested in its place. We felt authorized to collect it for

the account of John Calder because all correspondence concerning the loan had been made with him. All coupons as they matured had been received from him, and we looked to him, or rather to his successor, F. M. Calder, to procure for us the mortgage and note, together with a proper release, when final payment should be made."

Before this action was begun John Calder had died. Much earlier, Liberty Powell had died, and the note and mortgage in this case had been bequeathed to his daughter, Elizabeth M. Greenman, by whom these foreclosure proceedings were instituted. We shall not consider to what extent these deaths should be held to have so interrupted the continuous course of dealings that a doubt might be held properly to arise as to whether, against plaintiff, any inference of a custom was at all deducible from the acts or acquiescence of Powell or Calder. We shall rather consider the matter as argued by appellees,— that is, as though Powell and Calder, to the end of these transactions, had acted as each did up to the time of his death. Their deaths will be taken into consideration only as far as that fact excuses the failure of each to testify. John B. Swan testified as follows:

Q. You may state whether or not you paid the interest on that note accruing from time to time.

A. Yes, sir.

Q. To whom?

A. There was a part of the time before my interest coupons would come due I would get a statement from the Nebraska Mortgage & Investment Company, I would get a statement from them there when my interest was becoming due, and also when they sent that statement they would also send a letter or envelope with the firm's name and address on it. Sometimes I sent the money direct in that envelope, other times I would not have the money, knew I would not have the money, and I would write them so. My interest payments were semi-annual and sometimes it was June 14 when the payments became due and it was a bad time to have money on hand,

and I wrote to Mr. Toncray several times asking to get an extension on my time, and when I sent the money to pay these coupons I sent it to Mr. Toncray and I did all my business with C. H. Toncray.

Mr. Swan was with Mr. Christian when Mr. Christian paid the note, and it appears from the testimony of both these gentlemen that Mr. Christian paid the note to the Nebraska Mortgage & Investment Company on the faith of the fact that interest coupons had always been paid to Mr. Toncray. When this payment was made Mr. Christian received the following receipt:

"Fremont, Nebr., December 1st, 1890.

"Received from O. S. Christian fourteen hundred dollars, in payment of two mortgages of J. B. Swan.

"Nebr. Mt'ge & Invt. Co. L."

It is important to note carefully, before entering upon a further discussion of the facts, that Mr. Swan further testified that he never paid a coupon before it was due, but the payment was generally some time after the maturity of the coupon on which payment was made. After the execution of the note and mortgage in this case they were sent to Liberty Powell and remained in his possession, or in the possession of the agent of Mrs. Greenman, until after Mr. Christian had made the above noted payment. This agent and attorney, Addison C. Miller, put in evidence a power of attorney made by Mrs. Greenman, whereby he was constituted her attorney in fact, among other things, to look after her loans. He testified as follows: "I collected and received the interest on said note and mortgage, commencing with the coupon or payment due thereon June 1, 1887, down to and including the coupon due thereon June 1, 1890. This interest was all of it paid to me by Mr. John Calder, who then resided at New York Mills, a distance of three miles from my office. Said payments were made to me by Mr. Calder as follows: Coupon due June 1, 1887, was paid to me May 14, 1887. Coupon due December 1, 1887, was paid to me November 12, 1887. Coupon due June 1, 1888, was paid to me May

16, 1888.   Coupon due December 1, 1888, was paid to me November 10, 1888.   Coupon due June 1, 1889, was paid to me May 15, 1889.   Coupon due December 1, 1889, was paid to me November 6, 1889.   Coupon due June 1, 1890, was paid to me May 14, 1890.   Mr. Calder came into my office upon each occasion and paid me the money, and I surrendered to him the coupon so paid and he took the same away.   Mr. Calder represented upon each occasion that he had the money in hand to pay the coupons." There was no evidence which was not in harmony with these statements of this witness.   This evidence shows that Mr. Calder was never entrusted with the coupons to obtain the collection to be made on them, but that the coupons were surrendered to him because he had paid them just before with money which he claimed he had in hand to pay the coupon about to mature.   When Mr. Calder obtained each coupon in this way he sent it to his correspondent at Fremont.   There is, therefore, in this case no proof from which it can properly be inferred that Mr. Toncray, Mr. Dorsey, or the Nebraska Mortgage & Investment Company was in fact, or had ever been held out, as the agent of the holder of the note and mortgage involved in this litigation.   The judgment of the district court is therefore reversed, and this cause is remanded with directions to enter a decree of foreclosure as prayed.

REVERSED.