[No. 19657.  Department One.  March 25, 1926.]

A. R. Burtt, *Respondent,* v. Charles Schoening *et al.,*
*Appellants,* Alexander Myers, *as Receiver*
*etc., et al., Defendants.*[1]

[1] Bills and Notes (144) — Action — Amount of Recovery — Attorney's Fees.  An allowance of $400 as attorney's fees, in an action upon a note is warranted, without evidence as to its reasonableness, where it was less than 8% of the amount found due, the defendants did not deny the allegation that 10% was a reasonable fee, and the trial court was competent, in view of the nature of the case, to pass upon its reasonableness.

[2] Trusts (6)—Transactions Creating or Operating as Trusts. A declaration of trust, reciting that a mortgage was assigned to the trustees as collateral security for ten certain notes to various parties, and authorizing the trustee to foreclose the mortgage and sell the property, paying the notes out of the proceeds, the balance after indebtedness is paid to be turned over to the declarers of the trust, does not make the trustee a trustee for the note holders, they having no knowledge of the trust.

[3] Principal and Agent (36½, 57) — Collection of Notes Due Principal of Agent.  Payment of a note to an agent when the agent has neither possession of the note or express authority to receive the money, is at the peril of the payor, who must stand the loss as the one of two innocent parties who made it possible, on his failure to sustain the burden of showing that the agent had possession of the note.

[4] Bills and Notes (90, 99)— Payment or Discharge — Persons Against Whom Defense is Available.  One taking a note after maturity stands in as good a position as the maker, and a plea of payment which is not sustained as to the maker is of no avail as against the assignee after maturity.

Appeal from a judgment of the superior court for King county, Griffiths, J., entered June 27, 1925, upon findings in favor of the plaintiff, in an action upon contract, tried to the court.  Affirmed.

*Guie & Halverstadt,* for appellants.

*W. A. Wells* and *Battle, Hulbert, Gates & Helsell,* for respondent.

¹Reported in 244 Pac. 381.

HOLCOMB, J.—This action is upon a promissory note as against appellants, the Schoenings, and for other affirmative relief set up in the complaint.

The note is as follows:

"$5,000.00.    Seattle, Wash., December 28th, 1915.

"Three years after date, for value received, I promise to pay to the order of MARY H. MEANS, at the office of Fred E. Sander, Incorporated, the sum of FIVE THOUSAND DOLLARS, with interest at the rate of seven per cent per annum from date until paid, payable semi-annually, principal and interest payable in U. S. Gold Coin. For value received, each and every party signing or endorsing this note hereby waives presentment, demand, protest and notice of non-payment thereof, and binds himself thereon as a principal, not as a surety, and promises in case suit is instituted to collect the same or any portion thereof, to pay such sum as the court may adjudge reasonable as attorney's fees in such suit, and agrees to remain bound notwithstanding any extension or extensions that may be made to any party liable on this note, and consent is hereby given to any such extension or extensions and agrees, in case suit be brought to collect this note or any part thereof, that at the option of the holder thereof the venue of said suit may be laid in King County, Washington.                    "C. Schoening,
                         "Minnie Schoening."

Endorsed by Mary H. Means.

Appellants admitted the execution and delivery of the note to the original payee, Mary H. Means, but denied non-payment thereof, and alleged payment by virtue of certain transactions hereinafter referred to. The note also bears an endorsement on the face thereof, upon the margin, as follows: "Extended for five yrs. from December 28th, 1918." It will be observed that the note contains provisions for extensions to any party liable thereon, and consent is given to any such extensions. The note also provides that, in case of col-

lection by suit of the note or any portion thereof, such additional sum as the court may adjudge reasonable as attorney's fees in such suit should be allowed.

[1] Upon giving judgment for the whole amount of the note of $5,000, with interest at seven per cent per annum from December 28, 1923, the court also allowed attorney's fees in the sum of $400, which is among the matters complained of by appellants, they asserting that no evidence was given as to the reasonableness of an attorney's fee in the trial of the action, and the matter was not submitted to the trial court by stipulation. We find that appellants did not deny the allegation of respondent in his complaint that ten per cent of the amount found due is a reasonable sum to be allowed as attorney's fees, but denied only that ten per cent, or any other sum, is *chargeable* against either of appellants as attorney's fees. This denial is in harmony with appellants' defense of payment, in that no sum could be recovered against them. The trial court allowed less than eight per cent of the amount recovered, and we think the trial court was competent, in view of the nature of the case and the defense thereto, to pass upon the reasonableness of the attorney's fees without other evidence, and that that contention of appellants cannot be sustained.

In 1915, Schoening solicited the Seattle Land & Improvement Company (hereinafter referred to as "The Company") for a loan of $9,800, to pay indebtedness he and his co-appellant, his wife, subsequently divorced, owed. The company procured the funds from various clients for the purpose of making the loan, and formed what was called Trust No. 1. Appellants owned first mortgages against real property known as Gunther Highland View Tracts, upon which there was indebtedness aggregating $19,347.57. They assigned the mort-

gages to the company as collateral security for the payment of the ten notes evidencing the loan of $9,800, with the arrangement that the company was to foreclose the mortgages, acquire title to the land through sheriff's sale, hold the land in trust for appellants and sell the land for such prices as the company saw fit, applying the proceeds thereof toward the payment of the notes covering the $9,800, the smallest to be paid first, and the larger ones last.

The declaration of trust was executed by the company embodying those arrangements. It was as follows:

"Seattle, Washington, December 28th, 1916.
"DECLARATION OF TRUST

"This Is To Certify That the Mortgages assigned to us by the Peoples Savings Bank, and which are now being foreclosed and on which there is due about $19,-349.78, said property being in Gunther's Highland View Tracts, were assigned to us as collateral security for $9,800.00 in ten (10) notes, dated December 28th, 1915, or any renewals or extensions thereof, bearing 7% interest and payable as mentioned below, signed by Charles Schoening and Minnie Schoening, his wife, of King County, State of Washington, as follows, to-wit:

"1 note $1000.00 to R. Y. Stratton, 1 year from date.

"1 note $5000.00 Mary H. Means, 3 years from date.

"2 notes $1000.00 ea., Sarah E. Stratton, 3 years from date.

"1 note $300.00 J. J. Peter, 3 years from date.

"1 note $100.00 Paul Beckman, 3 years from date.

"1 note $200.00 Thos. F. McGough, 3 years from date.

"1 note $100.00 Henry K. Sander, 3 years from date.

"1 note $100.00 Ella Peter, 3 years from date.

"1 note $1000.00 signed by Palace Market Company (S. C. Roll and Charles Schoening) due one year from Aug. 7, 1916.

"As soon as the property is sold, time for redemption expired, sheriff's deed issued, we are to sell the property on such terms and conditions as we see fit, and out of the proceeds pay, first all costs of litigation, commissions, taxes, etc., then the above mentioned notes or any other notes or advancements made by us, the smaller first and the larger ones second, and the balance after all indebtedness has been paid is to be turned over to Charles Schoening and Minnie Schoening, his wife, or to their order.

"The Seattle Land & Improvement Company
"(Seal)                                By F. E. Sander,
                                        "President."

Appellants contend that the declaration of trust above set forth was for the benefit of the note-holders as well as for that of appellants, and that the note-holders were *cestuis que trustent*.

There is no evidence whatever that the note-holders had any knowledge of the existence of this declaration of trust. It was put in the safe of the company, and no copy was ever given to Mary H. Means, the original payee of the note in controversy nor to respondent, the purchaser thereof.

Pursuant to the declaration of trust, the company sold most of the property, received the proceeds of the sales thereof, and applied the money in payment of the notes as specified by the declaration, until they had paid all but the Means note, which had been sold to respondent, and another note not involved here. In June, 1922, the company rendered a statement to appellants, including a statement respecting another so-called trust covering another parcel of platted lots, called Trust No. 2, to the effect that all of the notes had been paid. At all times only a single account was kept by the company as to both trusts and sets of note-holders.

In August, 1922, the company returned all of the notes mentioned in the declaration of trust, excepting that involved in this action. It, as appears by its contents, had matured December 16, 1918. On May 19, 1919, respondent, having $5,000 to invest, purchased the Means note from the company. When delivered to him it bore an endorsement by Mary H. Means. It also bore a notation of the extension for five years. It was later discovered that the endorsement for the extension of time had been made by Fred Sander, the president of the company, as had also the endorsement of the name of Mary H. Means. Mary H. Means did not actually endorse the note until a few days before this suit was begun.

On July 1, 1922, appellants executed and delivered another note for $7,000, due three years after date, to the company. This was made at about the time of the accounting between appellants and the company as to both trusts and both sets of noteholders, and evidently in connection with that transaction.

The defense of appellants is that the company, from 1915 to 1924, sold enough real estate and collected enough money therefrom to have paid off all of the notes in full; that the company misappropriated some of the money collected, and for that reason the note involved herein has not been paid to the holder; that the company, in the collection of this money, was the agent of the note-holders; and that the loss, by reason of the defalcation on the part of the company, must fall on the holders of the notes.

The trial court found that the company was the agent of appellants for the collection and applying of the money and the sale of the real estate, and not the agent of the note-holders; that the note sued on herein had not been paid.

The twenty errors claimed by appellants involve findings made by the court and requested findings refused, the conclusions of law, the decree and the allowance of an attorney's fee. They are grouped by appellants into three groups:

[2] (1) Was the company the trustee of the note-holders, as well as of the appellants, in selling the land, receiving and collecting the moneys from the sales, and applying the same in liquidation of the notes under the declaration of trust?

Referring to the declaration of trust, there is nothing in it that made the company the trustee or agent of the note-holders, except for the purpose of transmitting the moneys received from the sale of appellants' real estate after all expenses of handling the same, and after paying off the mortgage indebtedness that had existed against it, and commissions for sales and renewals and extensions of loans to the note-holders. Appellants created the trusteeship. It was not an assignment for the benefit of creditors, nor did respondent or any of the note-holders have any notice of it so far as the evidence shows. Neither does the declaration of trust, or any other instrument, including the notes held by the note-holders, create any joint trusteeship for the payors of the notes and the payees. The declaration of trust expressly provides: "after all indebtedness has been paid," the balance should go to the appellants. The note involved herein refers in no way to any declaration of trust. There is no evidence whatever that respondent ever gave the company authority of any kind. He received the interest when remitted by the company to him semi-annually by mail. The company existed and did business in Seattle, and he lived in Everett. It is true that, as he testified, he had utmost confidence in Sander, presi-

7—138 WASH.

dent and manager of the company, and had known him since he had been ''cabin boy on a ship.'' The fact that he had confidence in Sander, however, sufficient to induce him to purchase a note which Sander represented was good and would be paid at any time on ten days' notice, does not imply that respondent made Sander, or the company managed by Sander, his agent.

[3] Appellants contend that when the new $7,000 note was given in July, 1922, and the accounting made between them and the company, the note involved herein could not be found, and that the agents of the company in charge thereof promised him that, when the note could be secured, it would be returned to him. If that is true, and we have no doubt that the testimony was true, it was no more than a promise of appellants' agent or sub-agent to perform a duty to them. The burden was on appellants to see that the note was returned to them before they paid the principal thereof. This is not a case where the debtor remitted to a broker and the broker remitted to the creditor.

'' 'If a debtor, owing money on a written security, pays to or settles with another as agent, it is his duty, at his peril, to see that the person thus paid or settled with is *in possession of the securities.* If not in possession the debtor must show that the person to whom he made the payment, or with whom he made the settlement, had special authority, or had been represented by the creditor to have such authority.' '' *Western Security Co. v. Douglass,* 14 Wash. 215, 44 Pac. 257.

There is no evidence in this case, so far as we have been able to discover, that respondent gave the company, or any of its agents, either general or special authority to collect the principal upon the note.

''Payment to an agent who has not either possession of the security or express authority to receive such money, is not good, and the principal may compel the debtor to pay again. The burden of proof is on the

debtor to show that the evidence of the indebtedness was in the possession of the agent at the time of payment.''. 21 R. C. L. 868.

See, also, *Campbell v. Gowans,* 35 Utah 268, 100 Pac. 397, 23 L. R. A. (N. S.) 414, and case note thereto; also case note, L. R. A. 1916B, 860.

''So, where a company guaranteed loans made by it, and it was customary for people making loans through it to present interest coupons for payment, which, to protect its guaranty the loan company paid and thereafter collected from the debtor, such mode of doing business is not sufficient to justify a debtor in paying the principal to the loan company without the possession of the security. *Stuart & Co. v. Asher,* 15 Colo. App. 403, 62 Pac. 1051.''

And authority to solicit and negotiate loans raises no presumption or implication of authority to collect such loans without the possession of the security. *Western Security Co. v. Douglass, supra.*

*Erickson v. Kendall,* 112 Wash. 26, 191 Pac. 842; *Kraus v. Dowell,* 119 Wash. 90, 204 Pac. 795; *Stephens v. Parker,* 121 Wash. 134, 208 Pac. 6, relied upon by appellants, are not in point. In the first case cited above, an assignee of a note and mortgage had failed for a long time to record her assignment, allowing the mortgage debtor to deal with another as her agent during all that time, or as actual owner of the mortgage, and note. In the second case cited the debtor had executed a note and mortgage to a company which afterwards became insolvent, knew no one else in the transaction, and always made her payments to that company. She never had notice of the sale of the note and mortgage to another. There were similar facts in the third case cited.

Here, respondent dealt with the company at arms' length. No fiduciary relations with Sander or the company were established by him.

We are thoroughly convinced that the trial court was right in holding as a matter of fact and law that the company was the agent of appellants, and on its failure to account to appellants they must bear the loss.

It is a well settled principle here that where one of two innocent persons must suffer by the acts of another, he who has placed it in the power of that other person to cause the loss, must sustain it. *Kucher v. Scott*, 96 Wash. 317, 165 Pac. 82.

[4] (2) The second grouped proposition of appellants is that, if the company as such trustee (that is, of the note-holders), collected funds from the sales of lands and credited appellants with such collections, having paid the Means note, though it did not remit the funds to the holder of the note, the defense of payment made in such manner, if proved, would be a bar to respondent's action, who was not a holder in due course before maturity, and who did not negotiate the note as against appellants until three years after the trustee had credited appellants with having paid the notes, and where appellants had no knowledge that the note had been transferred to respondent.

In support of this argument appellants rely upon the definition in the Negotiable Instruments Act (Rem. Comp. Stat. § 3443) to the effect that one is not a holder in due course who has taken an instrument after it became due.

The evidence is that respondent paid full value for the note in suit on May 19, 1919. That would, of course, be a few months after it became due; but appellants did not claim to have paid sufficient moneys for the benefit of the note-holders to pay all of the notes as the declaration of trust provided, at least before July, 1922, when the new note for $7,000 was given. Appellants certainly have no better standing under such cir-

cumstances than if the note had remained in the hands of the original payee. If they cannot sustain the burden of payment had the note continued in the hands of Mary H. Means by the actual facts of the transaction, of course it is immaterial that the note passed into the hands of another from the original payee after it became due. There is no other defense as to defect or infirmity in the note that appellants claim. ·

(3) The third grouped contention of appellants is that respondent constituted the company as agent and trustee to invest his money in the Means note, and receive and collect payments of interest and principal thereon. What we have said in discussing the first grouped proposition we think sufficiently answers this.

We find no error and the decree is affirmed.

TOLMAN, C. J., FULLERTON, PARKER, and MAIN, JJ., concur.